FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN DOE, by his guardian and next friend, Susan Doe, on behalf of themselves and all others similarly situated, *Plaintiff-Appellant*, v. JAMI SNYDER, Director of the Arizona Health Care Cost Containment System, in her official capacity, *Defendant-Appellee*. | No. 21-15668 D.C. No. 4:20-cv-00335-SHR OPINION |

Appeal from the United States District Court
for the District of Arizona
Scott H. Rash, District Judge, Presiding

Argued and Submitted November 19, 2021
Phoenix, Arizona

Filed March 10, 2022

Before:  Richard R. Clifton, Consuelo M. Callahan, and
Daniel A. Bress, Circuit Judges.

Opinion by Judge Callahan

## SUMMARY[*]

**Civil Rights**

The panel affirmed the district court's order denying plaintiffs' motion for preliminary injunctive relief in a putative class action brought by two teenage transgender individuals alleging that a provision of Arizona law that precludes coverage for gender reassignment surgeries violates federal law and is unconstitutional.

Plaintiffs John Doe and D.H. sought a preliminary injunction compelling the Arizona Health Care Cost Containment System, Arizona's Medicaid program, to pay for their immediate male chest reconstruction surgeries and asserted that the exclusion of gender reassignment surgeries in Arizona Administrative Code R9-22-205(B)(4) constitutes sex discrimination. The district court determined that plaintiffs' request was for a mandatory injunction and denied the request based on a finding that plaintiffs had not shown that male chest reconstruction surgeries were medically necessary for them or safe and effective for correcting or ameliorating their gender dysphoria. Following the filing of the appeal, plaintiffs withdrew their motion for class certification and voluntarily dismissed plaintiff D.H. from the case and appeal.

The panel agreed with the district court that plaintiffs sought a mandatory injunction and noted that the standard for issuing a mandatory injunction is high. On this

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

preliminary record, given facts specific to remaining plaintiff Doe and the irreversible nature of the surgery, Doe had not shown that the district court's findings were illogical, implausible, or without support in inferences that could be drawn from the facts in the record. The panel noted that (1) defendants had proffered competing expert testimony challenging plaintiffs' assertion that top surgery was for them medically necessary, safe and effective; (2) Doe sought preliminary injunctive relief when he was a minor, which raised concerns as to whether he sufficiently appreciated the consequences of irreversible surgery; and (3) Doe had serious psychiatric issues distinct from, or related to, his gender dysphoria and his expert psychiatrist had not opined as to whether Doe himself was a suitable candidate for surgery and had not met or examined Doe.

Although the panel did not reach the merits of Doe's constitutional and statutory challenges, because there was ongoing litigation in the district court on Doe's claims and to ensure appropriate proceedings below, the panel noted two additional points. First, for Doe's claim under the Constitution's Equal Protection Clause, the panel noted that this court had already held in *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019), that the level of scrutiny applicable to discrimination based on transgender status was "more than rational basis but less than strict scrutiny." Second, the district court's conclusion that the exclusion was not discriminatory as a threshold matter was based on an erroneous reading that *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), was limited to Title VII discrimination claims involving employment. The panel noted that Section 1557 of the Affordable Care Act provides that "an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 . . . be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under, any health program of activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a).  Given the similarity in language prohibiting sex discrimination in Titles VII and IX of the Education Amendment of 1972, the panel did not think *Bostock* could be limited in the manner the district court suggested.

**COUNSEL**

Asaf Orr (argued), Shannon Minter, and Christopher Stoll, National Center for Lesbian Rights, San Francisco, California; Brent P. Ray, King & Spalding LLP, Chicago, Illinois; Daniel C. Barr, Perkins Coie LLP, Phoenix, Arizona; Abigail K. Coursolle, National Health Law Program, Los Angeles, California; for Plaintiff-Appellant.

David T. Barton (argued) and Kathryn Hackett King, BurnsBarton PLC, Phoenix, Arizona; Logan T. Johnston, Johnston Law Offices, P.L.C., Phoenix, Arizona; for Defendant-Appellee.

Boyd Johnson, Jeannette Boot, Claire M. Guehenno, Cindy Pan and Wilmer Cutler Pickering, Hale and Dorr LLP, New York, New York, for Amici Curiae Pediatric Endocrine Society, World Professional Association for Transgender Health, and United States Professional Association for Transgender Health.

John C. Dwyer, Maureen P. Alger, Alexander J. Kasner, and Joshua S. Walden, Cooley LLP, Palo Alto, California; Peter C. Renn and Nora Huppert, Los Angeles, California; for Amici Curiae Transgender Youth Support Organizations.

Mary E. McAlister, Vernadette R. Broyles, and Joel H. Thornton, Child & Parental Rights Campaign, Inc., Johns Creek, Georgia, for Amici Curiae Keira Bell, Laura Becker, Sinead Watson, Kathy Grace Duncan, Laura Reynolds, Carol Freitas, and Detransvoices.org.

Cindy C. Albracht-Crogan, Cohen Dowd Quigley P.C., Phoenix, Arizona, for Amicus Curiae Society for Evidence Based Medicine.

Michael G. Moore, Esq., Law Office of Michael Garth Moore, Tucson, Arizona, for Amici Curiae Psychotherapeutic Experts in the Field of Treatment of Trans-Identified Children.

**OPINION**

CALLAHAN, Circuit Judge:

Plaintiffs John Doe and D.H, two teenage transgender individuals who were born female, filed this putative class action on behalf of themselves and others similarly situated, alleging that a provision of Arizona law that precludes coverage for gender reassignment surgeries violates federal law and is unconstitutional. They sought a preliminary injunction compelling the Arizona Health Care Cost Containment System (AHCCCS), Arizona's Medicaid program, to pay for their immediate male chest reconstruction surgeries. The district court denied their request for a mandatory preliminary injunction and Plaintiffs appealed.

Doe, the remaining Plaintiff,[1] asserts that the exclusion of gender reassignment surgeries in Arizona Administrative Code R9-22-205(B)(4) constitutes sex discrimination. In addition, Doe seeks a mandatory preliminary injunction, which may not be "granted unless extreme or very serious damage will result." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980)) (cleaned up). We review the denial of a preliminary injunction for abuse of discretion and the district court's factual findings for clear error. *See Puente Arizona v. Arpaio*, 821 F.3d 1098, 1103 (9th Cir. 2016). "Clear error exists if the finding is 'illogical, implausible, or without support in inferences that may be drawn from the facts in the record.'" *Edmo v. Corizon, Inc.*, 935 F.3d 757, 784-85 (9th Cir. 2019) (quoting *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 879 (9th Cir. 2014)).

The district court denied the request for a mandatory preliminary injunction based on a finding that Plaintiffs had not shown that male chest reconstruction surgeries were medically necessary for them or safe and effective for correcting or ameliorating their gender dysphoria. On this preliminary record, given facts specific to Doe and the irreversible nature of the surgery, Doe has not shown that the district court's findings are "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." Accordingly, we affirm the district court's denial of his request for a mandatory preliminary injunction.

---

[1] Following the filing of the appeal, Plaintiffs withdrew their motion for class certification and voluntarily dismissed D.H. from the case and appeal. Doe is now proceeding individually.

**I**

In August 2020, D.H., a seventeen-year-old transgender individual, and John Doe, a fifteen-year-old transgender individual, filed their complaint for declaratory and injunctive relief in the United States District Court for the District of Arizona. Plaintiffs were considered female at birth and have been undergoing medical treatment for gender dysphoria, including counseling and hormone therapy. They receive health coverage through the AHCCCS which covers their counseling and hormone therapy. Their health care providers recommend male chest reconstruction surgery to further alleviate their gender dysphoria. Their complaint alleged that a provision of Arizona law prohibits Medicaid coverage for "gender reassignment surgeries" (the "Challenged Exclusion"). Specifically, Arizona Administrative Code R9-22-205(B)(4) excludes the following from coverage:

> a. Infertility services, reversal of surgically induced infertility (sterilization), and *gender reassignment surgeries*;
>
> b. Pregnancy termination counseling services;
>
> c. Pregnancy terminations, unless required by state or federal law;
>
> d. Services or items furnished solely for cosmetic purposes; and
>
> e. Hysterectomies unless determined medically necessary.

(Emphasis added). Plaintiffs asserted that the Challenged Exclusion violates their civil rights under Section 1557 of the Patient Protection and Affordable Care Act (ACA), 42 U.S.C. § 18116; the Early and Periodic Screening, Diagnostic and Treatment requirements of the federal Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43), 1396d(a)(4)(B), 1396d(r); the comparability requirement of the Medicaid Act, 42 U.S.C. § 1396a(a)(10)(B); and the Equal Protection Clause of the Fourteenth Amendment to the Constitution.

Plaintiffs sought to represent a class of transgender individuals under the age of 21 who seek male chest reconstruction surgery (sometimes referred to as "top surgery"). [2] Along with their complaint, Plaintiffs filed a motion for preliminary injunction asserting that both Plaintiffs "urgently need male chest reconstruction surgery to alleviate their gender dysphoria" and that there is "broad consensus within the medical community that the surgery is a safe, effective, and medically necessary treatment for many

---

[2] The complaint sought the certification of the class, the appointment of Plaintiffs as representatives of the class, and the appointment of counsel for the class. It also sought preliminary and permanent injunctions on behalf of Plaintiffs, and all similarly situated individuals, and declaratory judgment that the denial of coverage for male chest reconstruction surgery violated the Medicaid Act, the ACA, and the Equal Protection Clause of the Fourteenth Amendment.

Plaintiffs defined the proposed class as "[a]ll transgender individuals under age 21 who are or will be enrolled in AHCCCS, have or will have a diagnosis of gender dysphoria, and are seeking or will seek coverage for male chest reconstruction surgery following a determination by their respective health care providers that the procedure is necessary to treat their gender dysphoria."

individuals with gender dysphoria, including adolescents."[3] The motion stated that the surgery is not cosmetic, but functional.  It explained that "[a]s a result of the surgery, a transgender male's body matches the person's internal identity, thereby providing enormous psychological relief, and enables them to interact with others and to function in a male identity much more effectively and confidently."  The motion further asserted that the surgery would eliminate the need for a chest binder, the extended use of which can cause difficulty breathing, exacerbate preexisting pulmonary conditions like asthma, and cause serious skin conditions.

The motion recited Plaintiffs' histories of gender dysphoria and their continued experiences of significant emotional distress and significant physical discomfort and pain.  Both Plaintiffs had been taking testosterone for more than a year and had regularly worn their binders for far longer than the maximum daily time recommended by their health care providers.  Both Plaintiffs also had various psychiatric issues.  Doe had a referral letter for surgery from his mental health provider but was unable to schedule a surgical consult because he cannot afford the surgery and the AHCCCS will not cover it.

---

[3] Plaintiffs asserted that the "process of undergoing these treatments is called 'gender transition' and is guided by well-established, internationally recognized standards of care developed by the World Professional Association for Transgender Health (WPATH)."  They further stated that the WPATH standards have been adopted by major professional associations of healthcare providers including the American Medical Association, American Psychological Association, the American Academy of Pediatrics, and the Endocrine Society.

## II

The district court denied Plaintiffs' motion for a preliminary injunction. It noted the Ninth Circuit in *Monarch Content Management LLC v. Arizona Department of Gaming*, 971 F.3d 1021, 1027 (9th Cir. 2019), had quoted the Supreme Court's holding in *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 20 (2008), which stated that: "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." The district court determined that Plaintiffs' request was for a mandatory injunction because they sought "an injunction that not only enjoins Defendant from enforcing the law, but orders Defendant to take an affirmative action by providing coverage for a medical procedure that would be otherwise excluded, thus going well beyond the status quo." The court held that a request for a mandatory injunction was subject to heightened scrutiny and would be granted only when extreme or very serious damage would result that was not compensable in damages, and the merits of the case were not doubtful. *See Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017); *Dahl v. HEM Pharms. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993).

The district court first considered whether Plaintiffs had shown that top surgery was for them medically necessary, safe, and effective. Plaintiffs had submitted a number of declarations, including one from a psychiatrist who specializes in treating children and adolescents with gender dysphoria, and another from a plastic surgeon who specializes in gender reassignment surgery and would perform the surgeries for Plaintiffs. Both are members of

WPATH. According to the district court, the purpose of WPATH's "Standards of Care . . . is to assist health providers in delivering medical care to transgender people to provide them with safe and effective treatment for gender dysphoria, in order to maximize their overall health, psychological well-being and self-fulfillment." The district court noted that the psychiatrist had treated over 300 children and adolescents with gender dysphoria and considers male chest reconstruction surgery safe and effective for adolescents. The court observed that the psychiatrist opined that surgical treatment is necessary for some transgender youth, but that he had not met, examined, or consulted with Doe to determine whether surgery is medically necessary for him. The plastic surgeon had conducted virtual consultations with Plaintiffs and opined that they appear to be good candidates for male chest reconstruction surgery, that he is confident they are fully aware of the risks and benefits of the procedure, and that the surgery "is a safe, effective, and medically necessary treatment for each of them, assuming the absence of any pathology."

Defendant responded with declarations from two experts, an endocrinologist and a psychiatrist specializing in sexuality. The endocrinologist asserted that the purported "professional consensus" embodied in the WPATH's Standard of Care exists only within its confines and that there is no high-quality study showing male chest reconstruction surgery is safe, effective, or optimal for treating minors with gender dysphoria. He pointed to a 2016 decision by the Centers for Medicare & Medicaid Services that declined to issue a national coverage determination on gender reassignment surgery for Medicare beneficiaries with gender dysphoria because the clinical evidence was inconclusive for the Medicare population. The

endocrinologist opined that irreversible top surgery should not be performed on Plaintiffs because there is no way to predict whether they will outgrow their gender dysphoria and minors are "still undergoing brain development and as such they are immature with respect to intellect, emotion, judgment, and self-control."

Defendant's second expert had been an early member of WPATH but now alleged that "WPATH represents a self-selected subset of the mental health professions . . . [and] does not capture the clinical experiences of others." The psychiatrist asserted that WPATH "does not welcome skepticism, and therefore, deviates from the philosophical core of medical science." He opined that there is no reliable scientific data to support surgical intervention in adolescents with gender dysphoria, that the surgery will not eliminate the incongruence of female genitalia, and there is no reliable way to predict which patients' gender dysphoria will continue into adulthood.

Defendant also submitted a recent opinion from the United Kingdom's High Court of Justice, which reviewed a National Health Service clinic's practice of prescribing puberty-suppressing medication to individuals under age 18 with gender dysphoria. Although it heard evidence that such treatment was "required in accordance with the international frameworks of WPATH and the Endocrine Society," the United Kingdom court nonetheless concluded that treatment was "experimental or innovative in the sense that there are currently limited studies/evidence of the efficacy or long-term effects of the treatment." The district court noted that although the case did not involve surgery and was not controlling authority, it suggested that the "irreversible surgery Plaintiffs seek here is also experimental and perhaps risky." The district court determined that "Plaintiffs have

not clearly shown the surgery is medically necessary for them or that it is safe and effective for correcting or ameliorating their gender dysphoria."

The district court then turned to the controlling law. It noted that to prevail on their discrimination claim under the Equal Protection Clause and Section 1557 of the ACA, Plaintiffs had to show that (1) the AHCCCS is federally funded, (2) they were denied benefits on the basis of membership in a protected class (sex), and (3) the denial of benefits is a but-for cause of their injuries. The parties did not dispute that the AHCCCS received federal funds, but sharply disputed the other two elements.

Plaintiffs asserted that they were denied benefits and discriminated against by the AHCCCS, because they are transgender, citing *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), and several cases from district courts in other states.

The district court did not find Plaintiffs' arguments compelling. First, it found their reliance on *Bostock* "unpersuasive" because the Supreme Court expressly limited its holding to Title VII claims involving employment and the case did not involve "a state Medicaid plan exclusion for surgical treatment for gender dysphoria in minors." The district court distinguished the cases from other district courts cited by Plaintiffs, noting that in those cases some coverages did not involve Medicaid, the plaintiffs were not minors, and the exclusions challenged were significantly different. The district court noted that in *Flack v. Wisconsin Department of Health Services*, 328 F. Supp. 3d 931 (W.D. Wis. 2018), the exclusion from Medicaid coverage included drugs and hormone therapy, whereas the Challenged Exclusion excluded only gender reassignment surgery, and did not exclude coverage for other treatments of gender

dysphoria such as hormone therapy. The district court agreed with Defendant that because the AHCCCS covers hormone treatment and mental health counseling for the treatment of gender dysphoria, Plaintiffs had failed to meet their high burden, especially because they "have not clearly shown the surgery they seek is safe and effective for treating gender dysphoria in adolescents." The district court further stated that because the AHCCCS covers certain treatments for gender dysphoria, Plaintiffs had not shown that the denial of coverage was based on sex rather than some other permissible rationale.

Finally, the district court addressed the balance of harm. Plaintiffs asserted that they would be irreparably harmed in the absence of an injunction both because such harm is presumed for violations of constitutional rights and because denying them surgery would cause them irreparable physical and emotional harm. The court noted that Defendant countered that Plaintiffs had not made the requisite showing of irreparable harm because: (1) "according to the Diagnostic and Statistical Manual of Mental Disorders Fifth Edition ('DSM-5'), gender dysphoria does not persist into adulthood for most children and, specifically, '[i]n natal females persistence has ranged from 12% to 50%'"; (2) Plaintiffs had not demonstrated that they are capable of providing informed consent, given their significant psychological disorders that pre-date their gender dysphoria; (3) one of the Plaintiffs had "worn a binder for five years without developing any skin conditions or exacerbating his asthma, so irreparable harm is unlikely"; and (4) Doe's "long-standing and pre-existing 'chronic post-traumatic stress disorder from early life attachment trauma' . . . should be addressed before irreversible surgical procedures are employed." The district court further noted that Plaintiffs

had not provided a declaration from any medical doctor who is treating Doe.

The court found that Plaintiffs had not met their heightened burden, noting it is not clear that the injury was not capable of compensation as Plaintiffs could pay for the surgeries out-of-pocket and seek reimbursement; and that the preliminary injunctive relief sought was identical to the ultimate relief sought. The district court noted that "the relief sought would completely change, rather than preserve, the status quo." The court concluded that it would be "premature to grant such relief prior to discovery and summary judgment briefing."

In sum, the district court denied the request for a preliminary injunction finding that Plaintiffs had "not clearly shown that the surgery they seek is medically necessary for them, that it is a safe and effective treatment for gender dysphoria in adolescents, or that the Challenged Exclusion violates the Medicaid Act, Section 1557, or the Equal Protection Clause." Plaintiffs filed a timely notice of appeal. On appeal, they limit their challenge to Section 1557 and the Equal Protection Clause, and do not challenge the district court's ruling under the Medicaid Act.

## III

We have jurisdiction under 28 U.S.C. § 1292(a)(1) to review the denial of a preliminary injunction, and we review such a denial for abuse of discretion. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). As noted, for a preliminary injunction to issue, a plaintiff must establish a likelihood of success on the merits, irreparable harm in the absence of preliminary relief, a balance of equities in the movant's favor, and that the injunction is in the public interest. *Cal. Trucking Ass'n v. Bonta*, 996 F.3d

644, 652 (9th Cir. 2021) (citing *Winter*, 555 U.S. at 20). In addition, we have applied a "sliding scale" to this standard, allowing a stronger showing of one element to offset a weaker showing of another. *Alliance for the Wild Rockies*, 632 F.3d at 1131.

Although the district court held that Plaintiffs sought a mandatory preliminary injunction, their briefs argue that they seek "a quintessential prohibitory injunction" because they "seek to enjoin enforcement of the exclusion against them as individuals so that their coverage may be evaluated in the same way as any other request for coverage, without application of the exclusion." Doe argues that he has shown that he has been denied his right to equal protection under the law because his request has been denied solely based on the Challenged Exclusion and not on any individualized assessment.

In *Marlyn Nutraceuticals*, 571 F.3d at 879, we defined a mandatory injunction as one that goes beyond simply maintaining the status quo and orders the responsible party to take action pending the determination of the case on its merits. Here, rather than maintain the status quo pendente lite, Plaintiffs sought to compel Defendant to act prior to the entry of a final judgment. Thus, we agree with the district court that Plaintiffs sought a mandatory injunction.

The standard for issuing a mandatory preliminary injunction is high. "In general, mandatory injunctions 'are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.'" *Id.*

(quoting *Anderson*, 612 F.2d at 1115).[4]  Moreover, as the district court's evaluation of Plaintiffs' alleged harm is a factual determination, we review it for clear error, which exists "if the finding is 'illogical implausible, or without support in inferences that may be drawn from the facts in the record.'"  *Edmo*, 935 F.3d at 784–85 (quoting *La Quinta Worldwide*, 762 F.3d at 879).

Here, Doe has not made a compelling showing of irreparable harm.  Although his underlying claims alleged discrimination based on sex, the proffered reason for seeking preliminary injunctive relief was the alleged irreparable harm to him if his surgery was delayed.  But to compel the issuance of a mandatory preliminary injunction, even where there has been a showing of likelihood of success on the underlying claim, a plaintiff need still show a likelihood of irreparable harm.  *Marlyn Nutraceuticals*, 571 F.3d at 877.  On appeal from the district court's finding of insufficient harm, Doe has the burden of showing that the district court's finding that there is not a likelihood of irreparable harm is illogical, implausible, or unsupported by the record.  *Edmo*, 935 F.3d at 784–85.

Doe has not met his burden.  First, although two experts testified that top surgery is safe and effective, even for adolescents, and has been approved by WPATH and most medical professional organizations, Defendant proffered competing expert testimony that WPATH's Standards of Care are not universally endorsed and questioning whether

---

[4] Based on this standard, we do not think that our "sliding scale" standard applies to this appeal.  We read *Marlyn Nutraceuticals*, 571 F.3d at 879, as directing that on review of the denial of a mandatory preliminary injunction based on a factual evaluation of harm, weakness in a plaintiff's showing of harm cannot be offset by a stronger showing on the merits of the underlying legal claim.

there have been any high-quality studies showing that male chest reconstruction surgery is safe, effective, or optimal for treating gender dysphoria.  For example, Defendant's expert noted that, as of 2016, the Centers for Medicare & Medicaid Services declined to issue a National Coverage Determination for gender reassignment surgery for Medicare patients with gender dysphoria "because the clinical evidence is inconclusive for the Medicare population."  In its order, the district court explicitly noted that testimony in describing the evidence from Defendant's expert.

Second, when Doe sought preliminary injunctive relief, he was a minor.  This gave rise to twin concerns: was his gender dysphoria permanent, and did he sufficiently appreciate the consequences of irreversible surgery?  There are indications in the record and in the amici briefs filed in this appeal that some individuals who present as transgender during adolescence revert to their natal gender later on, regardless of whether they have had top surgery.  Defendant argued, for instance, that gender dysphoria often resolves itself by adulthood and, specifically citing the Diagnostic and Statistical Manual of Mental Disorders Fifth Edition, that "[i]n natal females, persistence has ranged from 12% to 50%."  The district court explicitly noted that testimony as well in describing the evidence from Defendant's expert.  Also, given the evidence presented that the human brain continues to mature well into a person's twenties, it was reasonable for a district court to question whether Doe appreciated the impact of irreversible surgery and to require further counseling before "authorizing" surgery.

Third, these concerns are reinforced by the apparent fact that Doe had serious psychiatric issues distinct from, or related to, his gender dysphoria.  There were representations

before the district court that gender dysphoria might mask other psychiatric issues and that top surgery might not address those other issues. Relatedly, and significantly, Doe failed to provide a declaration from any psychiatrist or medical doctor who is treating him that attested to the necessity and suitability of the surgery in his particular case. And as the district court noted, Doe's expert psychiatrist had not opined as to whether Doe himself is a suitable candidate for surgery and had not met or examined Doe.

Our analysis highlights how *Edmo* is factually and procedurally distinguishable. There, the district court in a "carefully considered, 45-page opinion," supported by "detailed factual findings [that] were amply supported by its careful review of extensive evidence and testimony," determined that gender confirmation surgery was "medically necessary to treat Edmo's gender dysphoria." *Id*. at 780. Here, by contrast, the district court's 20-page order denying the motion for a preliminary injunction finds, based on a preliminary record, that "Plaintiffs have not clearly shown the surgery is medically necessary for them or that it is safe and effective for correcting or ameliorating their gender dysphoria."[5] This determination is not illogical,

---

[5] The cases cited by Plaintiffs from district courts in other states are similarly factually distinct. In *Flack*, both of the plaintiffs who sought injunctive relief were adults who had received treatment for gender dysphoria for a number of years. Indeed, one had already "had his uterus, fallopian tubes, ovaries and cervix removed through a hysterectomy with bilateral salpingo-oophorectomy." *Flack*, 328 F. Supp. 3d at 938; *See also Flack v. Wis. Dep't of Health Serv.*, 395 F. Supp. 3d 1001 (W.D. Wis. 2019) (granting summary judgment and enjoining the provision of Wisconsin law prescribing gender-conforming surgery and hormone therapy, but as to adults only). In *Boyden v. Conlin*, 341 F. Supp. 3d 979 (W.D. Wis. 2018), the plaintiffs were adults and the court ruled on cross motions for summary judgment, not on a request for preliminary injunction. In *Kadel v. Folwell*, 446 F. Supp. 3d 1 (M.D.N.C. 2020), the

implausible, or unsupported by the record that was before the court at that time.

We hold only that even accepting the merits of Doe's underlying claim of discrimination, he has not shown that the district court's denial of a mandatory preliminary injunction was unreasonable or unsupported by the record.[6] Although we do not reach the merits of Doe's constitutional and statutory challenges, because there is ongoing litigation in the district court on Doe's claims and to ensure appropriate proceedings below, we note two additional points.

First, for Doe's claim under the Constitution's Equal Protection Clause, we have already held in *Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019), that the level of scrutiny applicable to discrimination based on transgender status is "more than rational basis but less than strict scrutiny." *Id.* at 1201. *Karnoski* considered a policy that "discriminate[d] on the basis of transgender status on its face." 926 F.3d at 1201 n.18. The district court here did not address *Karnoski* in its order denying Plaintiffs' motion for a preliminary injunction because it concluded that the exclusion was not discriminatory as a threshold matter.

Second, this conclusion was based on an erroneous reading of *Bostock*. In considering whether the Supreme

---

court denied the defendants' motion to dismiss and did not consider injunctive relief. In *Fletcher v. Alaska*, 443 F. Supp. 3d 1024 (D. Alaska 2020), the plaintiff was a transgender adult and the court granted summary judgment.

[6] The other criteria for injunctive relief, the balance of hardships and public interest, do not weigh strongly in favor of either party and do not raise concerns that are not addressed in our discussion above.

Court's decision in *Bostock* applied to Plaintiffs' claim under Section 1557 of the ACA, the district court found Plaintiffs' reliance on *Bostock* "unpersuasive" because, it reasoned, "[t]he Supreme Court expressly limited its holding to Title VII claims involving employers who discriminated against employees because of their gay or transgender status." A faithful application of *Bostock* causes us to conclude that the district court's understanding of *Bostock* was too narrow.

Interpreting language in Title VII that made it unlawful for an employer to take an adverse employment action or otherwise to discriminate "because of . . . sex," *Bostock* held that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741. Thus, firing a person based on his sexual orientation or transgender status is discrimination "because of sex."

Section 1557 of the ACA provides that "an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program of activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. We construe Title IX's protections consistently with those of Title VII. *See, e.g.*, *Emeldi v. Univ. of Or.*, 673 F.3d 1218, 1224 (9th Cir. 2012), *as amended*, 698 F.3d 715 (9th Cir. 2012) ("[T]he Supreme Court has often looked to its Title VII interpretations of discrimination in illuminating Title IX.'" (quotations omitted); *see also Franklin v. Gwinnett*

*Cty. Pub. Schs.*, 503 U.S. 60, 75 (1992). Given the similarity in language prohibiting sex discrimination in Titles VII and IX, we do not think *Bostock* can be limited in the manner the district court suggested. *See also Bostock*, 140 S. Ct. at 1778–82 (Alito, J., dissenting) (anticipating that *Bostock* "is virtually certain to have far-reaching consequences" because "[o]ver 100 federal statutes prohibit discrimination because of sex," and listing in particular Title IX and the ACA). While the language in Title VII is "because of sex" and the language in Title IX is "on the basis of sex," *Bostock* used those phrases interchangeably throughout the decision. *See, e.g.*, *Bostock*, 140 S. Ct. at 1737–38, 1743–45, 1753.

To be sure, Defendant argues that the Challenge Exclusion does not discriminate based on sex because, in its view, Arizona only prohibits a medical procedure while allowing transgendered persons to receive other types of treatment. Doe responds that disallowing gender reassignment surgery should be treated as discriminating against transgender persons because they are the only ones seeking this surgery. The district court did not address this issue because it narrowly read *Bostock*. The district court may have opportunity to address this issue as the case proceeds.

## IV

We review only the district court's denial of Doe's request for a mandatory preliminary injunction. A mandatory preliminary injunction will not issue unless extreme or very serious damage will otherwise result. *Marlyn Nutraceuticals*, 571 F.3d at 879. Here, the district court determined, based on the evidence before it, that Doe had not shown that the surgery was medically necessary and safe and effective for correcting or ameliorating his gender dysphoria. This factual determination is reviewed for clear

error, which exists "if the finding is 'illogical, implausible, or without support in inferences that may be drawn from the facts in the record.'" *Edmo*, 935 F.3d at 784–85 (quoting *La Quinta Worldwide*, 762 F.3d at 879). Because Doe has not met his burden of showing that the district court's denial of a mandatory preliminary injunction was clear error, the district court's order is **AFFIRMED**.

Each side shall bear its own costs.