(Slip Opinion) OCTOBER TERM, 2021 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GOLAN *v.* SAADA

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 20–1034. Argued March 22, 2022—Decided June 15, 2022

The Hague Convention on the Civil Aspects of International Child Abduction requires the judicial or administrative authority of a Contracting State to order a child returned to the child's country of habitual residence if the authority finds that the child has been wrongfully removed to or retained in the Contracting State. The authority "is not bound to order the return of the child," however, if the authority finds that return would expose the child to a "grave risk" of "physical or psychological harm or otherwise place the child in an intolerable situation." The International Child Abduction Remedies Act (ICARA) implements the Convention in the United States, granting federal and state courts jurisdiction over Convention actions and directing those courts to decide cases in accordance with the Convention.

Petitioner Narkis Golan, a United States citizen, married respondent Isacco Saada, an Italian citizen, in Italy, where they had a son, B. A. S., in 2016. In 2018, Golan flew with B. A. S. to the United States to attend a wedding and, instead of returning to Italy, moved into a domestic violence shelter with B. A. S. Saada thereafter timely filed a petition with the U. S. District Court for the Eastern District of New York, seeking an order returning B. A. S. to Italy pursuant to the Hague Convention. The District Court concluded that B. A. S. would face a grave risk of harm if returned to Italy, given evidence that Saada had abused Golan and that being exposed to this abuse harmfully affected B. A. S. The court, however, ordered B. A. S.' return to Italy, applying Second Circuit precedent obligating it to "examine the full range of options that might make possible the safe return of a child" and concluding that ameliorative measures could reduce the risk to B. A. S. sufficiently to require his return. The Second Circuit vacated the return order, finding the District Court's ameliorative measures

insufficient. Because the record did not support concluding that no sufficient ameliorative measures existed, the Second Circuit remanded for the District Court to consider whether such measures, in fact, existed. After an examination over nine months, the District Court identified new ameliorative measures and again ordered B. A. S.' return. The Second Circuit affirmed.

*Held*: A court is not categorically required to examine all possible ameliorative measures before denying a Hague Convention petition for return of a child to a foreign country once the court has found that return would expose the child to a grave risk of harm. Pp. 8–16.

(a) "The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Abbott* v. *Abbott*, 560 U. S. 1, 10 (internal quotation marks omitted). When "a child has been wrongfully removed or retained" from his country of habitual residence, Article 12 of the Hague Convention generally requires the deciding authority (here, a district court) to "order the return of the child." T. I. A. S. No. 11670, S. Treaty Doc. No. 99–11, p. 9. But Article 13(b) of the Convention leaves a court with the discretion to grant or deny return, providing that a court "is not bound to order the return of the child" if it finds that the party opposing return has established that return would expose the child to a "grave risk" of physical or psychological harm. *Id.,* at 10. Nothing in the Convention's text either forbids or requires consideration of ameliorative measures in exercising this discretion. Pp. 8–11.

(1) Saada's primary argument is that determining whether a grave risk of harm exists necessarily requires considering whether any ameliorative measures are available. The two questions, however, are separate. A court may find it appropriate to consider both questions at once, but this does not mean that the Convention imposes a categorical requirement on a court to consider any or all ameliorative measures before denying return based on a grave-risk determination. Pp. 9–10.

(2) The discretion to courts under the Convention and ICARA includes the discretion to determine whether to consider ameliorative measures that could ensure the child's safe return. The Second Circuit's contrary rule—which imposes an atextual, categorical requirement that courts consider all possible ameliorative measures in exercising discretion under the Convention, regardless of whether such consideration is consistent with the Convention's objectives—"in practice, rewrite[s] the treaty," *Lozano* v. *Montoya Alvarez*, 572 U. S. 1, 17. Pp. 10–11.

(b) A district court's consideration of ameliorative measures must be guided by the legal principles and other requirements set forth in the

Convention and ICARA. The Second Circuit's rule improperly elevated return above the Convention's other objectives. The Convention does not pursue return exclusively or at all costs. Courts must remain conscious of all the Convention's objectives and requirements, which constrain courts' discretion to consider ameliorative measures. First, the Convention explicitly recognizes that any consideration of ameliorative measures must prioritize the child's physical and psychological safety. Second, consideration of ameliorative measures should abide by the Convention's requirement that courts addressing return petitions do not usurp the role of the court that will adjudicate the underlying custody dispute. Third, any consideration of ameliorative measures must accord with the Convention's requirement that courts "act expeditiously in proceedings for the return of children." A court therefore reasonably may decline to consider ameliorative measures that have not been raised by the parties, are unworkable, draw the court into determinations properly resolved in custodial proceedings, or risk overly prolonging return proceedings. Pp. 11–15.

(c) In this case, the District Court made a finding of grave risk, but never had the opportunity to inquire whether to order or deny return under the correct legal standard. Accordingly, it is appropriate to allow the District Court to apply the proper legal standard in the first instance, see *Monasky* v. *Taglieri*, 589 U. S. \_\_\_, \_\_\_. The District Court should determine whether the measures considered are adequate to order return in light of the District Court's factual findings concerning the risk to B. A. S., bearing in mind that the Convention sets as a primary goal the safety of the child. Pp. 15–16.

833 Fed. Appx. 829, vacated and remanded.

SOTOMAYOR, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 20–1034

## NARKIS ALIZA GOLAN, PETITIONER *v.* ISACCO JACKY SAADA

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 15, 2022]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

Under the Hague Convention on the Civil Aspects of International Child Abduction, Mar. 26, 1986, T. I. A. S. No. 11670, S. Treaty Doc. No. 99–11 (Treaty Doc.), if a court finds that a child was wrongfully removed from the child's country of habitual residence, the court ordinarily must order the child's return. There are, however, exceptions to that rule. As relevant here, a court is not bound to order a child's return if it finds that return would put the child at a grave risk of physical or psychological harm. In such a circumstance, a court has discretion to determine whether to deny return.

In exercising this discretion, courts often consider whether any "ameliorative measures," undertaken either "by the parents" or "by the authorities of the state having jurisdiction over the question of custody," could "reduce whatever risk might otherwise be associated with a child's repatriation." *Blondin* v. *Dubois*, 189 F. 3d 240, 248 (CA2 1999) (*Blondin I*). The Second Circuit has made such consideration a requirement, mandating that district courts independently "examine the full range of options that might

make possible the safe return of a child" before denying re-
turn due to grave risk, even if the party petitioning for the
child's return has not identified or argued for imposition of
ameliorative measures. *Blondin* v. *Dubois*, 238 F. 3d 153,
163, n. 11 (CA2 2001) (*Blondin II*).

The Second Circuit's categorical requirement to consider
all ameliorative measures is inconsistent with the text and
other express requirements of the Hague Convention.

## I

## A

The Hague Convention "was adopted in 1980 in response
to the problem of international child abductions during do-
mestic disputes." *Abbott* v. *Abbott*, 560 U. S. 1, 8 (2010).
One hundred and one countries, including the United
States and Italy, are signatories. Hague Conference on Pri-
vate Int'l Law, Convention of 25 Oct. 1980 on the Civil As-
pects of Int'l Child Abduction, Status Table, https://www.
hcch.net/en/instruments/conventions/status-table/?cid=24.

The Convention's "core premise" is that "'the interests of
children . . . in matters relating to their custody' are best
served when custody decisions are made in the child's coun-
try of 'habitual residence.'" *Monasky* v. *Taglieri*, 589 U. S.
___, ___ (2020) (slip op., at 2) (quoting Convention Pream-
ble, Treaty Doc., at 7). Accordingly, the Convention gener-
ally requires the "prompt return" of a child to the child's
country of habitual residence when the child has been
wrongfully removed to or retained in another country. Art.
1(a), Treaty Doc., at 7; see also Art. 12, *id.,* at 9.[1] This re-
quirement "ensure[s] that rights of custody and of access

―――――――

[1] The Convention defines a "wrongful" removal or retention as one that
breaches existing custody rights "under the law of the State in which the
child was habitually resident immediately before the removal or reten-
tion" if those rights "were actually exercised" or "would have been so ex-
ercised but for the removal or retention." Art. 3, Treaty Doc., at 7.

under the law of one Contracting State are effectively respected in the other Contracting States." Art. 1(b), *id.,* at 7.

Return of the child is, however, a general rule, and there are exceptions. As relevant here, the Convention provides that return is not required if "[t]here is a grave risk that . . . return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Art. 13(b), *id.,* at 10.[2] Because return is merely "a 'provisional' remedy that fixes the forum for custody proceedings," *Monasky*, 589 U. S., at \_\_\_ (slip op., at 3), the Convention requires that the determination as to whether to order return should be made "us[ing] the most expeditious procedures available," Art. 2, Treaty Doc., at 7; see also Art. 11, *id.,* at 9 (providing that the party petitioning for return has "the right to request a statement of the reasons for the delay" if the court "has not reached a decision within six weeks from the date of commencement of the proceedings").

Congress implemented the Convention in the International Child Abduction Remedies Act (ICARA), 102 Stat. 437, as amended, 22 U. S. C. §9001 *et seq.* ICARA permits a parent (or other individual or institution) seeking relief under the Convention to file a petition for return of a child in state or federal court, §§9003(a)–(b), and directs courts to "decide the[se] case[s] in accordance with the Convention," §9003(d). Consistent with the Convention, ICARA "empower[s] courts in the United States to determine only

_____

[2] The Convention also enumerates several other exceptions to the return requirement. Return is not required if the parent, institution, or body having care of the child seeking return was not exercising custody rights at the time of removal or had consented to removal, if the child objects to return and "has attained an age and degree of maturity at which it is appropriate to take account of its views," or if return would conflict with fundamental principles of freedom and human rights in the country from which return is requested. Arts. 13, 20, Treaty Doc., at 10, 11.

rights under the Convention and not the merits of any underlying child custody claims." §9001(b)(4); see Art. 19, Treaty Doc., at 11 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue").

Under ICARA, the party petitioning for the child's return bears the burden of establishing by a preponderance of the evidence that the child was wrongfully removed or retained. §9003(e)(1). If the court finds the child was wrongfully removed or retained, the respondent opposing return of the child has the burden of establishing that an exception to the return requirement applies. §9003(e)(2). A respondent arguing that return would expose the child to a grave risk of harm must establish that this exception applies by "clear and convincing evidence." §9003(e)(2)(A). Absent a finding that an exception applies, a child determined to be wrongfully removed or retained must be "promptly returned" to the child's country of habitual residence. §9001(a)(4).

B

Petitioner Narkis Golan is a citizen of the United States. She met respondent Isacco Saada, an Italian citizen, while attending a wedding in Milan, Italy, in 2014. Golan soon moved to Milan, and the two wed in August 2015. Their son, B.A.S., was born the next summer in Milan, where the family lived for the first two years of B.A.S.' life.

The following facts, as found by the District Court, are not in dispute. Saada and Golan's relationship was characterized by violence from the beginning. The two fought on an almost daily basis and, during their arguments, Saada would sometimes push, slap, and grab Golan and pull her hair. Saada also yelled and swore at Golan and frequently insulted her and called her names, often in front of other people. Saada once told Golan's family that he would kill her. Much of Saada's abuse of Golan occurred in front of his son.

In July 2018, Golan flew with B. A. S. to the United States to attend her brother's wedding. Rather than return as scheduled in August, however, Golan moved into a domestic violence shelter with B. A. S. In September, Saada filed in Italy a criminal complaint for kidnapping and initiated a civil proceeding seeking sole custody of B. A. S.

Saada also filed a petition under the Convention and ICARA in the U. S. District Court for the Eastern District of New York, seeking an order for B. A. S.' return to Italy. The District Court granted Saada's petition after a 9-day bench trial. As a threshold matter, the court determined that Italy was B. A. S.' habitual residence and that Golan had wrongfully retained B. A. S. in the United States in violation of Saada's rights of custody. The court concluded, however, that returning B. A. S. to Italy would expose him to a grave risk of harm. The court observed that there was "no dispute" that Saada was "violent—physically, psychologically, emotionally, and verbally—to" Golan and that "B. A. S. was present for much of it." App. to Pet. for Cert. 79a. The court described some of the incidents B. A. S. had witnessed as "chilling." *Ibid.* While B. A. S. was not "the target of violence," undisputed expert testimony established that "domestic violence disrupts a child's cognitive and social-emotional development, and affects the structure and organization of the child's brain." *Id.,* at 79a–80a, and n. 37.[3] Records indicated that Italian social services, who had been involved with the couple while they lived in Italy, had also concluded that "'the family situation entails a developmental danger' for B. A. S.*" Id.,* at 80a. The court found that Saada had demonstrated no "capacity to change his behavior," explaining that Saada "minimized or tried to excuse

——————
[3] The court noted that "[t]here were isolated incidents of possible abuse" of B. A. S. based on Golan's testimony that Saada had inadvertently hit and pushed B. A. S. while targeting her and Golan's brother's testimony that Saada had spanked B. A. S. aggressively, accusations that Saada disputed. App. to Pet. for Cert. 79a, n. 37; see *id.,* at 54a–55a, 61a.

his violent conduct" during his testimony and that Saada's
"own expert said . . . that [Saada] could not control his an-
ger or take responsibility for his behavior." *Ibid.*

The court nonetheless ordered B. A. S.' return to Italy
based on Second Circuit precedent obligating it to "'exam-
ine the full range of options that might make possible the
safe return of a child to the home country'" before it could
"'deny repatriation on the ground that a grave risk of harm
exists.'" *Id.,* at 81a (quoting *Blondin II*, 238 F. 3d, at 163,
n. 11). The Second Circuit based this rule on its view that
the Convention requires return "if at all possible." *Blondin
I*, 189 F. 3d, at 248. To comply with these precedents, the
District Court had required the parties to propose "'amelio-
rative measures'" that could enable B. A. S.' safe return.
App. to Pet. for Cert. 81a.[4] Saada had proposed that he
would provide Golan with $30,000 for expenses pending a
decision in Italian courts as to financial support, stay away
from Golan until the custody dispute was resolved, pursue
dismissal of the criminal charges he had filed against Go-
lan, begin cognitive behavioral therapy, and waive any
right to legal fees or expenses under the Convention. The
court concluded that these measures, combined with the
fact that Saada and Golan would be living separately,
would "reduce the occasions for violence," thereby amelio-
rating the grave risk to B. A. S. sufficiently to require his
return. *Id.,* at 81a–82a.

On Golan's appeal of this return order, the Second Circuit

―――――――
[4] Courts of Appeals use the terms "undertakings" and "ameliorative
measures" interchangeably. See, *e.g., Blondin I*, 189 F. 3d 240, 248 (CA2
1999) (referring to "ameliorative measures"); *Simcox* v. *Simcox*, 511 F. 3d
594, 604–606 (CA6 2007) (referring to "undertakings"). Although Saada
asserts that the latter is broader than the former, he does not argue that
the difference is determinative in this case. Accordingly, we use "ame-
liorative measures," the term employed by the Second Circuit in this
case.

vacated the order, finding the District Court's measures in-
sufficient to mitigate the risk of harm to B. A. S. Emphasiz-
ing that the District Court's factual findings provided "am-
ple reason to doubt that Mr. Saada will comply with these
conditions," the Second Circuit concluded that "the District
Court erred in granting the petition subject to (largely) un-
enforceable undertakings" without "sufficient guarantees of
performance." 930 F. 3d 533, 540, 542–543 (2019). Because
the record did "not support the conclusion that there exist
*no* protective measures sufficient to ameliorate the grave
risk of harm B. A. S. faces if repatriated," the court re-
manded for the District Court to "consider whether there
exist alternative ameliorative measures that are either en-
forceable by the District Court or supported by other suffi-
cient guarantees of performance." *Id.,* at 543 (emphasis
added).

To comply with the Second Circuit's directive, over the
course of nine months, the District Court conducted "an ex-
tensive examination of the measures available to ensure B.
A. S.'s safe return to Italy." App. to Pet. for Cert. 12a. The
District Court directed the parties to appear for status con-
ferences and to submit status reports and supplemental
briefs, and the court corresponded with the U. S. Depart-
ment of State and the Italian Ministry of Justice. At the
court's instruction, the parties petitioned the Italian courts
for a protective order, and the Italian court overseeing the
underlying custody dispute issued a protective order bar-
ring Saada from approaching Golan for one year. In addi-
tion, the Italian court ordered that an Italian social services
agency oversee Saada's parenting classes and therapy and
that visits between Saada and B. A. S. be supervised.[5]

The District Court concluded that these measures were
sufficient to ameliorate the harm to B. A. S. and again

———————
[5] Separately, the Italian criminal court dismissed the kidnapping
charges against Golan.

granted Saada's petition for B. A. S.' return.  It rejected Golan's argument that Saada could not be trusted to comply with a court order, expressing confidence in the Italian courts' abilities to enforce the protective order.  The District Court additionally ordered Saada to pay Golan $150,000 to facilitate B. A. S.' return to Italy and to cover Golan's and B. A. S.' living costs while they resettled.  The Second Circuit affirmed, concluding that the District Court did not clearly err in determining that Saada likely would comply with the Italian protective order, given his compliance with other court orders and the threat of enforcement by Italian authorities of its order.  833 Fed. Appx. 829 (2020).

This Court granted certiorari to decide whether the Second Circuit properly required the District Court, after making a grave-risk finding, to examine a full range of possible ameliorative measures before reaching a decision as to whether to deny return, and to resolve a division in the lower courts regarding whether ameliorative measures must be considered after a grave-risk finding.[6]  595 U. S. ___ (2021).

## II
### A

"The interpretation of a treaty, like the interpretation of a statute, begins with its text."  *Abbott*, 560 U. S., at 10 (internal quotation marks omitted).  As described above, when "a child has been wrongfully removed or retained" from his country of habitual residence, Article 12 of the Hague Convention generally requires the deciding authority (here, a district court) to "order the return of the child."  Treaty Doc.,

---

[6] Compare *In re Adan*, 437 F. 3d 381, 395 (CA3 2006) (requiring consideration of ameliorative measures); *Gaudin* v. *Remis*, 415 F. 3d 1028, 1035 (CA9 2005) (same); *Blondin II*, 238 F. 3d 153, 163, n. 11 (CA2 2001) (same), with *Acosta* v. *Acosta*, 725 F. 3d 868, 877 (CA8 2013) (consideration not required in all circumstances); *Baran* v. *Beaty*, 526 F. 3d 1340, 1346–1352 (CA11 2008) (same); *Danaipour* v. *McLarey*, 386 F. 3d 289, 303 (CA1 2004) (same).

at 9. Under Article 13(b) of the Convention, however, a court "is not bound to order the return of the child" if the court finds that the party opposing return has established that return would expose the child to a "grave risk" of physical or psychological harm. *Id.,* at 10. By providing that a court "is not bound" to order return upon making a grave-risk finding, Article 13(b) lifts the Convention's return requirement, leaving a court with the discretion to grant or deny return.

Nothing in the Convention's text either forbids or requires consideration of ameliorative measures in exercising this discretion. The Convention itself nowhere mentions ameliorative measures. Nor does ICARA, which, as relevant, instructs courts to "decide the case in accordance with the Convention" and accordingly leaves undisturbed the discretion recognized in the Convention. 22 U. S. C. §9003(d). The longstanding interpretation of the Department of State offers further support for the view that the Convention vests a court with discretion to determine whether to order return if an exception to the return mandate applies. See 51 Fed. Reg. 10510 (1986) (explaining that "a court in its discretion need not order a child returned" upon a finding of grave risk); see also *Abbott*, 560 U. S., at 15 (explaining that the Executive Branch's interpretation of the Convention "is entitled to great weight" (internal quotation marks omitted)).

Unable to point to any explicit textual mandate that courts consider ameliorative measures, Saada's primary argument is that this requirement is implicit in the Convention's command that the court make a determination as to whether a grave risk of harm exists. Essentially, Saada argues that determining whether a grave risk of harm exists necessarily requires considering whether any ameliorative measures are available.

The question whether there is a grave risk, however, is separate from the question whether there are ameliorative

measures that could mitigate that risk.  That said, the question whether ameliorative measures would be appropriate or effective will often overlap considerably with the inquiry into whether a grave risk exists.  See *Simcox* v. *Simcox*, 511 F. 3d 594, 607–608 (CA6 2007) (explaining that the appropriateness and utility of ameliorative measures correlate with the gravity of the risk to the child).  In many instances, a court may find it appropriate to consider both questions at once.  For example, a finding of grave risk as to a part of a country where an epidemic rages may naturally lead a court simultaneously to consider whether return to another part of the country is feasible.  The fact that a court may consider ameliorative measures concurrent with the grave-risk determination, however, does not mean that the Convention imposes a categorical requirement on a court to consider any or all ameliorative measures before denying return once it finds that a grave risk exists.[7]

Under the Convention and ICARA, district courts' discretion to determine whether to return a child where doing so would pose a grave risk to the child includes the discretion

––––––––––

[7] Saada argues that the approach of other signatory countries, including the United Kingdom, supports the position that consideration of ameliorative measures is required.  See, *e.g., In re E*, [2011] UKSC 27 ¶52 (stating that the focus of the return inquiry should be on the sufficiency of protective measures where there are disputed allegations of domestic violence).  The Hague Conference on Private International Law's Guide to Good Practice, which the Hague Conference issued to encourage consistent application of the grave-risk exception internationally, also offers some support for this position, explaining that courts generally should consider "the circumstances as a whole, including whether adequate measures of protection are available."  1980 Child Abduction Convention: Guide to Good Practice, Pt. VI, Art. 13(1)(b), p. 31, ¶41 (2020).  The Convention itself, however, leaves contracting states free to require or not require consideration of ameliorative measures, and consistent with most signatory countries outside the European Union, see, *e.g., Arthur & Secretary, Dept. of Family & Community Servs. and Anor*, [2017] Fam-CAFC 111 ¶69 (Austl.), Congress has not chosen to require such consideration.

whether to consider ameliorative measures that could en-
sure the child's safe return. The Second Circuit's rule, "in
practice, rewrite[s] the treaty," *Lozano* v. *Montoya Alvarez*,
572 U. S. 1, 17 (2014), by imposing an atextual, categorical
requirement that courts consider all possible ameliorative
measures in exercising this discretion, regardless of
whether such consideration is consistent with the Conven-
tion's objectives (and, seemingly, regardless of whether the
parties offered them for the court's consideration in the first
place). See *Blondin I*, 189 F. 3d, at 249 (requiring district
court not to "limit itself to the single alternative placement
initially suggested by [the appellant]" but instead affirma-
tively to "develop a thorough record to facilitate its deci-
sion," including by "mak[ing] any appropriate or necessary
inquiries" of the government of the country of habitual res-
idence and invoking the aid of the Department of State).

B

While consideration of ameliorative measures is within a
district court's discretion, "[d]iscretion is not whim." *Mar-
tin* v. *Franklin Capital Corp.*, 546 U. S. 132, 139 (2005). A
"motion to a court's discretion is a motion, not to its inclina-
tion, but to its judgment; and its judgment is to be guided
by sound legal principles." *Ibid.* (internal quotation marks
and alteration omitted). As a threshold matter, a district
court exercising its discretion is still responsible for ad-
dressing and responding to nonfrivolous arguments timely
raised by the parties before it. While a district court has no
obligation under the Convention to consider ameliorative
measures that have not been raised by the parties, it ordi-
narily should address ameliorative measures raised by the
parties or obviously suggested by the circumstances of the
case, such as in the example of the localized epidemic. See
*supra,* at 10.

In addition, the court's consideration of ameliorative
measures must be guided by the legal principles and other

requirements set forth in the Convention and ICARA. The Second Circuit's rule, by instructing district courts to order return "if at all possible," improperly elevated return above the Convention's other objectives. *Blondin I*, 189 F. 3d, at 248. The Convention does not pursue return exclusively or at all costs. Rather, the Convention "is designed to protect the interests of children and their parents," *Lozano*, 572 U. S., at 19 (ALITO, J., concurring), and children's interests may point against return in some circumstances. Courts must remain conscious of this purpose, as well as the Convention's other objectives and requirements, which constrain courts' discretion to consider ameliorative measures in at least three ways.

First, any consideration of ameliorative measures must prioritize the child's physical and psychological safety. The Convention explicitly recognizes that the child's interest in avoiding physical or psychological harm, in addition to other interests, "may overcome the return remedy." *Id.,* at 16 (majority opinion) (cataloging interests).[8] A court may therefore decline to consider imposing ameliorative measures where it is clear that they would not work because the risk is so grave. Sexual abuse of a child is one

––––––––––

[8] The explanatory report for the Convention, which is "recognized by the [Hague] Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention," supports this understanding. 51 Fed. Reg. 10503. The explanatory report describes that the general "interest of the child in not being removed from its habitual residence," the foundation for the general return principle, "gives way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation." 1980 Conférence de La Haye de droit international privé, Enlèvement d'enfants, E. Pérez-Vera, Explanatory Report, in 3 Actes et documents de la Quatorzième session, p. 433, ¶29 (1982). This Court has repeatedly referenced the report in Hague Convention cases, without "decid[ing] whether this Report should be given greater weight than a scholarly commentary." *Abbott* v. *Abbott*, 560 U. S. 1, 19 (2010); see, *e.g., Monasky* v. *Taglieri*, 589 U. S. ___, ___, n. 2 (2020) (slip op., at 8, n. 2).

example of an intolerable situation. See 51 Fed. Reg. 10510. Other physical or psychological abuse, serious neglect, and domestic violence in the home may also constitute an obvious grave risk to the child's safety that could not readily be ameliorated. A court may also decline to consider imposing ameliorative measures where it reasonably expects that they will not be followed. See, *e.g., Walsh* v. *Walsh*, 221 F. 3d 204, 221 (CA1 2000) (providing example of parent with history of violating court orders).

Second, consideration of ameliorative measures should abide by the Convention's requirement that courts addressing return petitions do not usurp the role of the court that will adjudicate the underlying custody dispute. The Convention and ICARA prohibit courts from resolving any underlying custody dispute in adjudicating a return petition. See Art. 16, Treaty Doc., at 10; 22 U. S. C. §9001(b)(4). Accordingly, a court ordering ameliorative measures in making a return determination should limit those measures in time and scope to conditions that would permit safe return, without purporting to decide subsequent custody matters or weighing in on permanent arrangements.[9]

Third, any consideration of ameliorative measures must accord with the Convention's requirement that courts "act expeditiously in proceedings for the return of children."

————————

[9] The Department of State expressed this view in a 1995 letter to a United Kingdom official, emphasizing that any ameliorative measures ordered to facilitate return "should be limited in scope and further the Convention's goal of ensuring the prompt return of the child" and that measures that "address in great detail issues of custody, visitation, and maintenance" would be "questionable" given the Convention's reservation of custody issues for resolution in the country of the child's habitual residence. App. to Brief for United States as *Amicus Curiae* on Pet. for Cert. 2a (Letter from C. Brown, Assistant Legal Adviser for Consular Affairs, U. S. Dept. of State, to M. Nicholls, Lord Chancellor's Dept., Child Abduction Unit, United Kingdom (Aug. 10, 1995)).

Art. 11, Treaty Doc., at 9.[10]  Timely resolution of return petitions is important in part because return is a "provisional"
remedy to enable final custody determinations to proceed.
*Monasky*, 589 U. S., at ___ (slip op., at 3) (internal quotation
marks omitted).  The Convention also prioritizes expeditious determinations as being in the best interests of the
child because "[e]xpedition will help minimize the extent to
which uncertainty adds to the challenges confronting both
parents and child."  *Chafin* v. *Chafin*, 568 U. S. 165, 180
(2013).  A requirement to "examine the full range of options
that might make possible the safe return of a child," *Blondin II*, 238 F. 3d, at 163, n. 11, is in tension with this focus
on expeditious resolution.  In this case, for example, it took
the District Court nine months to comply with the Second
Circuit's directive on remand.  Remember, the Convention
requires courts to resolve return petitions "us[ing] the most
expeditious procedures available," Art. 2, Treaty Doc., at 7,
and to provide parties that request it with an explanation
if proceedings extend longer than six weeks, Art. 11, *id.,* at
9.  Courts should structure return proceedings with these
instructions in mind.  Consideration of ameliorative
measures should not cause undue delay in resolution of return petitions.

To summarize, although nothing in the Convention prohibits a district court from considering ameliorative
measures, and such consideration often may be appropri-

_____

[10] Conferring with other countries, when necessary to resolve a petition, need not take long.  The Hague Conference on Private International
Law, the intergovernmental organization that adopted the Hague Convention, has an extensive list of cases and references to practices of virtually all the signatory countries.  Moreover, the Conference has established a network of judges in signatory countries who are available to
engage in direct judicial communications about the application of the
Convention.  See Hague Conference on Private Int'l Law, The International Hague Network of Judges, https://www.hcch.net/en/instruments/
conventions/specialised-sections/child-abduction/ihnj.

ate, a district court reasonably may decline to consider ame-
liorative measures that have not been raised by the parties,
are unworkable, draw the court into determinations
properly resolved in custodial proceedings, or risk overly
prolonging return proceedings. The court may also find the
grave risk so unequivocal, or the potential harm so severe,
that ameliorative measures would be inappropriate. Ulti-
mately, a district court must exercise its discretion to con-
sider ameliorative measures in a manner consistent with
its general obligation to address the parties' substantive ar-
guments and its specific obligations under the Convention.
A district court's compliance with these requirements is
subject to review under an ordinary abuse-of-discretion
standard.

### III

The question now becomes how to resolve the instant
case. Golan urges that this Court reverse, arguing that the
ameliorative measures adopted by the District Court are in-
adequate for B. A. S.' protection and otherwise improper.
The United States, as *amicus curiae*, suggests remanding
to allow the District Court to exercise its discretion in the
first instance under the correct legal standard. Brief for
United States as *Amicus Curiae* 32.

Under the circumstances of this case, this Court con-
cludes that remand is appropriate. The Convention re-
quires courts to make a discretionary determination as to
whether to order return after making a finding of grave
risk. The District Court made a finding of grave risk, but
never had the opportunity to engage in the discretionary
inquiry as to whether to order or deny return under the cor-
rect legal standard. This Court cannot know whether the
District Court would have exercised its discretion to order
B. A. S.' return absent the Second Circuit's rule, which im-
properly weighted the scales in favor of return. Accord-

ingly, it is appropriate to follow the ordinary course and allow the District Court to apply the proper legal standard in the first instance. Cf. *Monasky*, 589 U. S., at ___–___ (slip op., at 16–17) (declining to follow the "[o]rdinar[y]" course of ordering remand where the determination in question was nondiscretionary and there was no "reason to anticipate that the District Court's judgment would change on a remand").

Remand will as a matter of course add further delay to a proceeding that has already spanned years longer than it should have. The delay that has already occurred, however, cannot be undone. This Court trusts that the District Court will move as expeditiously as possible to reach a final decision without further unnecessary delay. The District Court has ample evidence before it from the prior proceedings and has made extensive factual findings concerning the risks at issue. Golan argues that the ameliorative measures ordered intrude too greatly on custodial determinations and that they are inadequate to protect B. A. S.' safety given the District Court's findings that Saada is unable to control or take responsibility for his behavior. The District Court should determine whether the measures in question are adequate to order return in light of its factual findings concerning the risk to B. A. S., bearing in mind that the Convention sets as a primary goal the safety of the child.

*    *    *

The judgment of the United States Court of Appeals for the Second Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*