**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| BOGDAN RADU, | No. 22-16316 |
| *Petitioner-Appellee,* | D.C. No. 4:20-cv-00246-RM |
| v. | |
| PERSEPHONE JOHNSON SHON, | |
| *Respondent-Appellant.* | OPINION |

Appeal from the United States District Court
for the District of Arizona
Rosemary Márquez, District Judge, Presiding

Argued and Submitted November 21, 2022
San Francisco, California

Filed March 13, 2023

Before: Mary H. Murguia, Chief Judge, and Ryan D.
Nelson and Danielle J. Forrest, Circuit Judges.

Opinion by Judge R. Nelson;
Concurrence by Chief Judge Murguia

## SUMMARY[*]

### Hague Convention

The panel affirmed the district court's order granting, on a second remand, Bogdan Radu's petition against Persephone Johnson Shon for the return, pursuant to the Hague Convention, of the parties' two children to Germany.

The district court held an evidentiary hearing and granted Radu's petition. The district court found a grave risk of psychological harm if the children were returned to Germany in the custody of Radu, but it determined that those risks would be mitigated if the children returned in Shon's temporary custody. The district court ordered Shon to return with the children and retain full custody until the German courts resolved the merits of the parties' custody dispute. On appeal, in *Radu I*, the panel vacated and remanded for the district court to determine whether the sole-custody measure would be enforceable in Germany.

On remand, the district court held a second hearing. In a second return order, the district court concluded that the enforceability of the sole-custody remedy was uncertain but was no longer necessary. Based on new evidence that a German court would take months to resolve custody, the district court held that ordering Shon to return with the children to Germany, where the default rule was joint custody, sufficiently ameliorated the risk of psychological harm. Shon again appealed. The panel remanded for

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

reconsideration in light of *Golan v. Saada*, 142 S. Ct. 1880 (2022), which clarified that, where there is a grave risk that a child's return would expose the child to physical or psychological harm, consideration of ameliorative measures is discretionary rather than mandatory.

On remand, the district court ordered return based on the existing record. Following *Golan*, the district court exercised discretion to consider ameliorative measures. The district court again stated that ordering Shon to return to Germany with the children would ameliorate the risk of psychological harm. Shon filed the current appeal. On a limited remand, the district court issued a clarifying order.

Agreeing with other circuits, the panel held that, in cases governed by the Hague Convention, the district court has discretion as to whether to conduct an evidentiary hearing following remand and must exercise that discretion consistent with the Convention. The panel held that, on the second remand, the district court did not abuse its discretion in declining to hold a third evidentiary hearing when the factual record was fully developed.

The panel held that, in making determinations about German procedural issues, the district court neither abused its discretion nor violated Shon's due process rights by communicating with the State Department and, through it, the German Central Authority. The panel further held that the Federal Rules of Evidence and its hearsay rules do not apply to foreign law materials.

Finally, the panel held that the record provided adequate support for the district court's fact findings underlying its clarified return order, and the law-of-the-case doctrine did not prevent the district court from revisiting its prior ruling on grave risk. The panel therefore affirmed the district

court's grant of the petition for the children's return with the ameliorative measures ordered by the district court.

Concurring, Chief Judge Murguia wrote that she concurred fully in the principal opinion. She wrote separately to express her view that, in *Radu I*, the panel should not have declined to allocate a burden of proof on the reasonableness of an ameliorative measure. Chief Judge Murguia wrote that a future panel should follow other circuits and hold that, when a petitioner proffers a measure to ameliorate the grave risk of harm, it is the petitioner's burden to establish that the measure is reasonably appropriate and effective.

**COUNSEL**

Kelly A. Powers (argued) and Stephen J. Cullen, Miles & Stockbridge PC, Washington, D.C.; Shaun P. Kenney, The Kenney Law Firm PC, Tucson, Arizona; for Respondent-Appellant.

Michelle E. Irwin (argued), Fenwick & West LLP, Seattle, Washington; Rina Plotkin and Todd R. Gregorian, Fenwick & West LLP, San Francisco, California; for Petitioner-Appellee.

**OPINION**

R. NELSON, Circuit Judge:

This is the third appeal in an international child custody dispute between Persephone Johnson Shon and Bogdan Radu over their minor children. While the family was residing in Germany, Shon took the children to the United States and has refused to return them. The Hague Convention generally requires children to be returned to the state of habitual residence so that country's courts may adjudicate the merits of any custody disputes. We previously vacated and remanded the district court's first order to return the children to Germany. *See Radu v. Shon*, 11 F.4th 1080 (9th Cir. 2021) [*Radu I*], *vacated*, 142 S. Ct. 2861 (2022), *in light of Golan v. Saada*, 142 S. Ct. 1880 (2022). Because the Supreme Court issued its decision in *Golan* while we were considering Shon's appeal of the second return order, we also remanded that order for the district court's reconsideration. The district court then granted the petition a third time. We now affirm.

I

A

The Hague Convention on the Civil Aspects of International Child Abduction (Convention), Oct. 25, 1980, T.I.A.S. No. 11670, "address[es] 'the problem of international child abductions during domestic disputes.'" *Lozano v. Montoya Alvarez*, 572 U.S. 1, 4 (2014) (quoting *Abbott v. Abbott*, 560 U.S. 1, 8 (2010)). It aims "to secure the prompt return of children wrongfully removed" and "ensure that rights of custody and of access" are respected across Contracting States. Convention Art. 1. All

signatories must "use the most expeditious procedures available" to implement these goals. Convention Art. 2. Contracting States must also create Central Authorities to facilitate cooperation. Convention Art. 6 & 7. Domestically, the International Child Abduction Remedies Act (ICARA) implements the Convention's rules, creates the United States Central Authority, and gives our courts jurisdiction to adjudicate disputes under the Convention. 22 U.S.C. § 9001 et seq.

"The Convention's central operating feature is the return remedy." *Abbott*, 560 U.S. at 9. This remedy is "provisional" because it merely "fixes the forum for custody proceedings" and leaves the merits to the country of habitual residence. *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020) (internal quotation marks and citation omitted). Under the Convention, courts "shall order the return" of "a child [who] has been wrongfully removed or retained." Convention Art. 12. Article 13 provides exceptions. Relevant here, the court "is not bound to order the return" of a child if the party opposing return establishes that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm." Convention Art. 13(b). Under Article 13(b), courts have "the discretion to grant or deny return." *Golan v. Saada*, 142 S. Ct. 1880, 1892 (2022). That discretion allows for the consideration of measures that would ameliorate the grave risk. *See id.* at 1893.

B

Radu and Shon married in 2011 in the United States. Their older child, O.S.R., was born in the United States in 2013, and their younger child, M.S.R., was born in Germany in 2016. Both children are citizens of the United States but not Germany. From 2016 to 2019, Radu, Shon, and their

children lived in Germany.  Shon took O.S.R. and M.S.R. from Germany to the United States in June 2019.  Shon and the children have since lived with Shon's parents in Arizona, despite Radu's wishes for the children to be brought back to Germany.

1

Radu petitioned for the children to be returned to Germany in federal district court in Arizona in June 2020. The district court held an evidentiary hearing and granted Radu's petition.  The court found a grave risk of psychological harm if the children were returned to Germany in the custody of Radu.  The court determined, however, that those risks would be mitigated if the children returned to Germany in Shon's temporary custody.  So the court ordered Shon to return with the children and retain full custody until the German courts resolved the merits of the custody dispute. At that time, *Gaudin v. Remis* made the consideration of ameliorative measures mandatory.  *See* 415 F.3d 1028, 1035 (9th Cir. 2005) ("Courts applying ICARA have consistently held that, before denying the return of a child because of a grave risk of harm, a court must consider alternative remedies that would allow both the return of the children to their home country and their protection from harm." (internal quotation marks and citation omitted)).

Shon appealed.  We vacated and remanded for the district court to determine whether the sole-custody measure would be enforceable in Germany.  *See Radu I*, 11 F.4th at 1089–90.

2

On remand, the district court held a second hearing at which Shon presented expert testimony and the parties

testified.  Shon's expert, a Germany-licensed attorney, stated that the temporary sole-custody order would not be enforceable because Germany does not recognize ameliorative measures.  He also testified that a German court may take up to six months to decide custody because the children would not be considered habitually resident in Germany until then.  Furthermore, because the children are not German citizens, he testified that neither Shon nor Radu could initiate German custody proceedings or obtain protective measures from abroad.

Shon testified that her savings would not cover travel or living expenses in Germany but conceded that her parents, who had assisted her financially during this case, had paid for her plane tickets for her previous return from Germany. She was also afraid of being arrested upon returning to Germany but did not know of any pending legal matters at that time.  Radu testified that he would pay for airfare and housing for Shon and their children pending the custody determination.  He promised to maintain a separate household and to cooperate with Shon.  He also testified that Germany has a child-protection agency that could ensure the children's safety if Shon became unavailable.

The district court then contacted the State Department, Office of Children's Issues' country officer for Germany, who contacted the German Central Authority for the court. The court did not receive a binding statement on the time needed for a German court to determine custody.  But the German Central Authority cited Section 155 of the Act on Proceedings in Family Matters and Matters of Non-Contentious Jurisdiction, which provides for handling of custody issues "in an expedited manner."  The German Central Authority also confirmed that Germany has youth

welfare offices that may conduct home visits or take custody of children if necessary.

In a second return order, the district court concluded that the enforceability of the sole-custody remedy was uncertain. But that was no longer necessary because the district court had considered the risk of psychological harm over too long of a time period. Based on the new evidence that a German court would take months to resolve custody, the court held that ordering Shon to return with the children to Germany—where the default rule was joint custody—sufficiently ameliorated the risk of psychological harm.

Shon again appealed. We stayed the appeal pending the Supreme Court's resolution of *Golan* and eventually remanded for reconsideration in light of *Golan*'s clarification that consideration of ameliorative measures is discretionary rather than mandatory. *See* 142 S. Ct. at 1892–93.

### 3

The district court did not hold another hearing on the second remand but ordered return based on the existing record. Following *Golan*, the district court exercised discretion to consider ameliorative measures. Relying on the second return order's analysis, the district court again stated that ordering Shon to return to Germany with the children would ameliorate the risk of psychological harm. It denied Shon's request for a new evidentiary hearing, partially because there was no new evidence about Radu's interactions with the children and partially because a hearing would contravene the Convention's directive for expeditious resolution.

The present appeal arises from the third return order. Given the parties' uncertainty about aspects of the ordered remedy, and unresolved logistical issues, we ordered a limited remand while retaining jurisdiction to avoid further delay. *See Friery v. L.A. Unified Sch. Dist.*, 448 F.3d 1146, 1150 (9th Cir. 2006) (ordering "a limited remand to the district court").

We directed the district court to clarify (1) its current Article 13(b) grave-risk finding and ameliorative measure(s) ordered, (2) whether Radu must pay for airfare, (3) whether Radu must pay for separate living arrangements, (4) the custody arrangements (sole or joint) while Shon was temporarily residing in Germany, (5) the custody arrangements if Shon is no longer able to legally reside in Germany before a German court decides custody, (6) the need to notify German child protective services upon the children's arrival, and (7) whether, if necessary, German child protective services have jurisdiction to oversee the children's wellbeing.

The district court answered those questions. First, it explained that the grave risk of psychological harm arose only if the children remained in Radu's sole custody for a longer time, and that no harm would arise if Shon and Radu had joint custody or if Radu had sole custody for a limited duration. *Radu v. Shon*, No. CV-20-00246-TUC-RM, 2023 WL 142908, at *2 (D. Ariz. Jan. 10, 2023). Second, Shon must pay for her and the children's airfare back to Germany. *Id.* at *3. Third, Radu must pay for separate living arrangements because Shon would take unpaid leave and could not work in Germany. *Id.* Fourth, the parties would have joint custody, as German law provides, pending a final custody determination. *Id.* Fifth, in the event Shon could not remain until the merits decision, the children would enter

Radu's physical custody.  *Id.*  Sixth, the court determined that notifying German child protective services was unnecessary.  *Id.*  Seventh, the court judicially noticed the existence of *jugendamt*, the German child protective services agency, and explained that the record suggests that the agency would have authority over the children once they arrive in Germany.  *Id.*

We asked for supplemental briefs about the clarification order's effect.  The issues currently before us are whether the district court should have conducted an evidentiary hearing during the second remand or the limited remand, refrained from contacting the State Department, or ultimately determined that the record supported its ameliorative measure.

## II

The Convention is in force between the United States and Germany.  *See Holder v. Holder*, 305 F.3d 854, 859 (9th Cir. 2002).  We have jurisdiction under 28 U.S.C. § 1291 and "review the district court's factual determinations for clear error, and the district court's application of the Convention to those facts *de novo*."  *Flores Castro v. Hernandez Renteria*, 971 F.3d 882, 886 (9th Cir. 2020).

## III

## A

Shon contends that the district court should have held a new evidentiary hearing during the second remand or the limited remand.  She relies on *Gaudin*'s instruction that "[t]he questions before the district court on remand will be whether a grave risk of harm *now* exists, and if so, whether that risk can be minimized through an alternative remedy,"

415 F.3d at 1036, for her position that a new hearing is necessary to determine the current conditions.

Neither ICARA nor the Convention specify when a court must hold an evidentiary hearing. ICARA instructs courts to "decide the case in accordance with the Convention." 22 U.S.C. § 9003(d). And the Convention directs courts to "act expeditiously in proceedings for the return of children." Convention Art. 11. It also permits a court to "order the return of the child at *any time*" notwithstanding the other provisions. Convention Art. 18 (emphasis added). We accordingly review the district court's decision not to hold a new evidentiary hearing for abuse of discretion. Under that standard, we affirm the district court unless it commits a legal error in interpreting the Convention, or clearly errs in determining the facts from the record. *See United States v. Hinkson*, 585 F.3d 1247, 1259 (9th Cir. 2009) (en banc).

Any categorical rule requiring new hearings would contravene the Convention's directive for expeditious resolution. The district court is far better situated to determine the exact procedures necessary—whether a hearing or supplemental briefing, for example—to aid its resolution of the case. A per se rule would impede that flexibility with minimal upside. Under some circumstances, a refusal to hold a new hearing could constitute an abuse of discretion. But the district court here declined a third evidentiary hearing because the evidence of Radu's treatment of the children—on which the court based its ameliorative measure and grave-risk finding—had not changed; Radu had not had contact with the children since the earlier hearings. Under these circumstances, another

hearing would add little to a well-developed record and needlessly delay proceedings.[1]

Our sister circuits agree. In *March v. Levine*, the question presented was whether the district court improperly granted summary judgment to a father petitioning for his children's return without allowing discovery or a hearing on the merits. *See* 249 F.3d 462, 468 (6th Cir. 2001). The Sixth Circuit affirmed. Recognizing that Convention cases are unique, the court explained that "neither [the Convention nor ICARA] expressly requires a hearing or discovery"; instead they require "expeditious action." *Id.* at 474. The court also found persuasive that "courts in other Contracting States to the treaty have also upheld summary proceedings on review." *Id.* at 475 (discussing Australian court proceedings).

The Tenth Circuit reached the same conclusion in *West v. Dobrev*, reasoning that Article 18's permission to order return at any time provides trial courts "a substantial degree of discretion in determining the procedures necessary to resolve a petition filed pursuant to the Convention and ICARA." 735 F.3d 921, 929 (10th Cir. 2013).

We find these decisions persuasive and conclude that *Gaudin* does not require otherwise. There, we said that the lapse of time made it "unnecessary for us to evaluate the merits of the district court's finding that a grave risk of psychological harm" existed five years ago. *Gaudin*, 415 F.3d at 1036. This was because the court should "consider

---

[1] Shon asserts that she would have presented a child psychology expert at the new hearing. When Shon previously tried to introduce that expert at the second hearing, she did not object to the district court's exclusion of the expert.

the effect of any possible remedies in light of circumstances as they exist in the present." *Id.* We did not, however, specify the way the district court should consider present circumstances or mandate a new evidentiary hearing upon every remand.

We now hold that, in cases governed by the Convention, the district court has discretion as to whether to conduct an evidentiary hearing following remand and must exercise that discretion consistent with the Convention.**[2]** The district court did not abuse its discretion in declining to hold a third evidentiary hearing when the factual record was fully developed.

## B

Shon next asserts that the district court's communications with the State Department and the German Central Authority were ex parte, resulted in hearsay evidence, and violated Shon's due process rights.

We once "treat[ed] questions of foreign law as questions of fact to be pleaded and proved." *de Fontbrune v. Wofsy*, 838 F.3d 992, 994 (9th Cir. 2016). But Federal Rule of Civil Procedure 44.1 clarified that an interpretation of foreign law "must be treated as a ruling on a question of law." Accordingly, like any legal issue, "the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the

---

[2] Contrary to Shon's argument, we did not direct the district court to hold a hearing on the limited remand. Even if the district court wrongly interpreted our order as forbidding an evidentiary hearing, we did not require one. Nor was one needed when the existing evidence already sufficiently addressed the factual issues identified in our limited remand order. Thus, any error would have been harmless.

Federal Rules of Evidence." Fed. R. Civ. P. 44.1. Moreover, "the court is not limited by material presented by the parties; it may engage in its own research and consider any relevant material thus found." Fed. R. Civ. P. 44.1 advisory committee's note to 1966 amendment. That said, "expert testimony accompanied by extracts from foreign legal materials has been and will likely continue to be the basic mode of proving foreign law." *Universe Sales Co., Ltd. v. Silver Castle, Ltd.*, 182 F.3d 1036, 1038 (9th Cir. 1999).

Courts nonetheless have an "independent obligation to adequately ascertain relevant foreign law, even if the parties' submissions are lacking." *de Fontbrune*, 838 F.3d at 997. Though international comity requires American courts to "carefully consider a foreign state's views about the meaning of its own laws," that deference has its limits. *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018). "The appropriate weight in each case . . . will depend upon the circumstances; a federal court is neither bound to adopt the foreign government's characterization nor required to ignore other relevant materials." *Id.*

Understanding the laws and procedures of another country can be difficult—especially when trying to make such determinations expediently, as the Convention directs. And the State Department and foreign Central Authorities are proper and useful resources when evaluating a foreign legal landscape. *See* Convention Art. 7. A sister circuit, for instance, has directed a district court "to make any appropriate or necessary inquiries of the [foreign government] . . . and to do so, *inter alia*, by requesting the aid of the United States Department of State, which can communicate directly with that foreign government." *Blondin v. Dubois*, 189 F.3d 240, 249 (2d Cir. 1999). Indeed, we contemplated the district court's ability to seek

assistance from the State Department when we remanded the first return order.  *See Radu I*, 11 F.4th at 1090–91.

Shon does not contest any foreign legal conclusion but challenges the methods the court used to determine German procedural issues.  Though a legal conclusion on foreign law is reviewed de novo, *see de Fontbrune*, 838 F.3d at 1000, we have indicated that a district court's selection of methods to evaluate foreign law is discretionary.  *See Tobar v. United States*, 639 F.3d 1191, 1200 (9th Cir. 2011) (noting that the district court could "inquire further into the content of Ecuadorian law" "in its discretion").  Accordingly, we review the district court's methods of foreign law research for abuse of discretion.  This deferential standard is necessary to preserve the flexibility that Rule 44.1 affords courts to research foreign law.  And our de novo review of the ultimate legal conclusion ensures that foreign legal issues are treated like domestic ones.

The district court neither abused its discretion nor violated Shon's due process rights by communicating with the State Department and, through it, the German Central Authority.  "[I]ndependent judicial research" on a legal question "does not implicate the judicial notice and ex parte issues spawned by independent factual research."  *de Fontbrune*, 838 F.3d at 999; *see also G&G Prods. LLC v. Rusic*, 902 F.3d 940, 948 (9th Cir. 2018) ("formal notice" of court's intent to research foreign law not required).  Nor do the Federal Rules of Evidence and its hearsay rules apply to foreign law materials, much as legal research on domestic law cannot trigger evidentiary objections.  *See de Fontbrune*, 838 F.3d at 999.

Of course, "both trial and appellate courts are urged to research and analyze foreign law independently," *Twohy v.*

*First Nat. Bank of Chi.*, 758 F.2d 1185, 1193 (7th Cir. 1985); *see also de Fontbrune*, 838 F.3d at 997, and with due consideration for the parties' submissions. But here, the district court did not view itself bound by information received from the State Department; it properly considered and weighed that information alongside the testimony of the parties and Shon's expert. Shon—who does not challenge any of the legal conclusions that the district court reached— fails to persuade that the district court abused its discretion in the way it reached them.

C

Finally, Shon challenged several factual findings underlying the district court's third return order and asserted that the law-of-the-case doctrine prohibited the court from revisiting its grave-risk finding. We review factual findings for clear error, which occurs if "the finding is illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Doe v. Snyder*, 28 F.4th 103, 106 (9th Cir. 2022) (internal quotation marks and citation omitted). "While a district court has no obligation under the Convention to consider ameliorative measures that have not been raised by the parties, it ordinarily should address ameliorative measures raised by the parties or obviously suggested by the circumstances of the case . . . ." *Golan*, 142 S. Ct. at 1893.

On remand, the district court clarified that the minor children would be at a grave risk of psychological harm only if they returned to Germany and remained in Radu's sole custody for years due to the cumulative nature of psychological harm. *Radu*, 2023 WL 142908, at *2. If Shon could not remain in Germany past the expiration of her tourist visa (around ninety days), then the court found no

issue with Radu taking physical custody of the children for a short time until the final custody determination is made by German authorities. *Id.* Because no exception to return would apply under those circumstances, the court ordered the children's return.

Many of the specific findings that Shon first challenged—such as the enforceability of sole custody as an ameliorative measure and her parents' willingness to travel to Germany—are immaterial under the clarified return order, which does not rely on these facts. As to the findings that remain at issue, the record provides adequate support. *See Landis v. Wash. State Major League Baseball Stadium Pub. Facilities Dist.*, 11 F.4th 1101, 1105 (9th Cir. 2021) ("This is deferential review; we reverse only if we are left with a definite and firm conviction that a mistake has been committed." (internal quotation marks and citation omitted)).

First, the record supports the district court's determination that the time frame in which a German court would determine custody would be a few months rather than years. The district court found that a merits decision would be made within months. *Radu*, 2023 WL 142908, at *2. Shon's German law expert's testimony supports this finding. He testified that a German court would likely require the children to live in Germany for up to six months before determining custody but that the court would also have discretion to make an earlier decision. And the district court cited a German statute providing that the determination of custody issues "shall have priority" and "shall be handled in an expedited manner." That the waiting period is likely to be months instead of years is supported by the record.

Second, the hearing testimony supports the court's determination that Shon could return with the children. When asked during the hearing if she would accompany the children, Shon answered, "Of course." She also said that she could take humanitarian leave of up to six months from her job with her manager's approval. Although Shon expressed some financial concerns, the district court relied on other evidence, such as her employment, lifestyle, and ability to obtain her parents' financial support. That the district court ordered Radu to pay for a separate household for Shon and the children, *Radu*, 2023 WL 142908, at \*3, further minimizes these concerns. Shon's ability to remain in Germany until the final custody decision is no longer relevant: The district court clarified that no grave risk arises if the children enter Radu's physical custody for the remaining time.

Third, based on the lack of any evidence or testimony about pending criminal charges in Germany, the court drew the supported inference that none existed.

Finally, the law-of-the-case doctrine did not prevent the district court from revisiting its prior ruling on grave risk. "[T]he law-of-the-case doctrine 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (quoting *Messinger v. Anderson*, 225 U.S. 436, 444 (1912)). It "applies most clearly where an issue has been decided by a higher court." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018). We did not decide the grave-risk issue in the first appeal because Radu did not challenge the district court's finding, but we noted that "the facts here do seem to be a borderline case whether an Article 13(b) finding is warranted." *Radu I*, 11 F.4th at 1089. Even

though the district court found grave risk in its first return order, it was free to revisit this ruling based on updated evidence about the likely time frame for German courts to decide the merits of the custody dispute. *See Radu*, 2023 WL 142908, at *2. As we have discussed, *Gaudin* instructs district courts to decide whether grave risk exists based on the current circumstances. 415 F.3d at 1036.

IV

The district court did not err in refusing to hold a new evidentiary hearing or in consulting the State Department. Adequate evidence supports the factual findings that Shon challenges. We thus affirm the district court's grant of the petition for the children's return with the ameliorative measures ordered by the district court.[3]

**AFFIRMED.**

---

[3] Shon's motion to stay the lower court action is denied as moot.

MURGUIA, Chief Judge, concurring:

I concur fully in the principal opinion. I write separately to express my view that, in *Radu I*, we should not have "decline[d] to allocate a burden of proof on the reasonableness of" an ameliorative measure. *Radu v. Shon*, 11 F.4th 1080, 1089 (9th Cir. 2021) [*Radu I*], *cert. granted, judgment vacated*, 142 S. Ct. 2861 (2022). When we did so, we noted: "Congress is capable of assigning burdens of proof and has already done so under [the International Child Abduction Remedies Act ("ICARA")]. We need not add judicial constraints absent from ICARA or the [Hague Convention on the Civil Aspects of International Child Abduction ("Convention")]." *Id.* (citation omitted).

It is true that the Convention and ICARA provide that the petitioner has the burden to establish a prima facie case of wrongful removal. *See Golan v. Saada*, 142 S. Ct. 1880, 1888–89 (2022). And both the Convention and ICARA then shift the burden onto the respondent to prove that, if returned, the removed children would be subject to a grave risk of physical or psychological harm. *See id.* But neither the Convention nor ICARA mentions measures that could ameliorate such a grave risk. *Id.* at 1892. Rather, ameliorative measures are a "judicial construct." *Danaipour v. McLarey*, 286 F.3d 1, 21 (1st Cir. 2002) (citation omitted).

After further consideration, I now believe that when a petitioner proffers a measure to ameliorate the grave risk of harm, it should be the petitioner's burden to establish that the measure is reasonably appropriate and effective. Three of our sister circuits have adopted this view, and we should have adopted it in *Radu I*. *See Simcox v. Simcox*, 511 F.3d 594, 611 (6th Cir. 2007); *Acosta v. Acosta*, 725 F.3d 868, 877 (8th Cir. 2013); *Danaipour*, 286 F.3d at 21. Placing this

burden on the petitioner does not preclude district courts
from considering, on their own, potential ameliorative
measures not raised by the parties that are "obviously
suggested by the circumstances of the case." *Golan*, 142 S.
Ct. at 1893. It only assists district courts' decisionmaking
and guides their discretion as to the measures raised by a
petitioner seeking to mitigate a grave risk of harm.

This issue is no longer squarely presented in this case,
and accordingly, we cannot resolve it. But because the
Supreme Court vacated *Radu I* in light of *Golan*, a future
panel may—and, in my view, should—properly allocate the
burden of proof in an appropriate case.